1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Andrew Shamis
AZ Bar No. 037343
*ashamis@shamisgentile.com*
**SHAMIS & GENTILE, P.A.**
14 NE 1st Ave, Suite 705
Miami, FL 33132
Telephone: 305.479.2299
*Attorney for Plaintiff and Proposed Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

**RAUL SANTOS**, individually, and on behalf of all others similarly situated,

            Plaintiff,

vs.

**BACKCHECKED, LLC** and **CERTIFIED EMPLOYMENT SCREENING INC. d/b/a AMERICHEK**

         Defendants.

Case No. _____

**CLASS ACTION COMPLAINT**
**1. Negligence**
**2. Negligence** *per se*
**3. Breach of Third-Party Beneficiary Contract**
**4. Breach of Implied Contract**
**5. Invasion of Privacy**
**6. Breach of Fiduciary Duty**
**7. Violation of the California Unfair Competition Law**
**8. Violation of the California Consumer Records Act**
**9. Declaratory Judgement**

**DEMAND FOR JURY TRIAL**

Plaintiff Raul Santos ("Plaintiff"), on behalf of himself and all others similarly situated, alleges the following Class Action Complaint (the "Action") against Defendants BackChecked LLC ("BackChecked") and Certified Employment Screening Inc., d/b/a Americhek ("Americhek") (collectively "Defendants") upon personal knowledge as to himself and his own actions, and upon information and belief, including the investigation of counsel as follows:

## I.    INTRODUCTION

1.    Plaintiff seeks monetary damages and injunctive and declaratory relief arising from Defendants failure to safeguard the Personally Identifiable Information[1] ("PII" or "Private Information") of Plaintiff and Class members, which resulted in unauthorized access to its information systems on or around September 26, 2024 and the compromised and unauthorized disclosure of that Private Information, causing widespread injury and damages to Plaintiff and the proposed (defined below) members.

2.    Defendant, BackChecked, LLC is a background screening platform[2].

---

[1] The Federal Trade Commission ("FTC") defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."17 C.F.R. § 248.201(b)(8). To be clear, according to Defendant, not every type of information included in that definition was compromised in the subject data breach.
[2] https://www.backchecked.com (last accessed Dec. 22, 2024)

CLASS ACTION COMPLAINT

3.      Defendant Certified Employment Screening Inc., d/b/a Americhek is a background screening company[3].

4.      As explained in detail herein, Defendants detected unusual activity in their computer systems and ultimately determined that an unauthorized third party accessed their network and obtained certain files from their systems on or around September 26, 2024 ("Data Breach").[4]

5.      As a result of the Data Breach, which Defendants failed to prevent, the Private Information of Plaintiff and the proposed Class members, was stolen, including their names, addresses, dates of birth, driver's license number, and Social Security numbers.[5]

6.      Defendants' investigation concluded that the Private Information compromised in the Data Breach included Plaintiff's and other Class Members information (together, "Clients").

7.      Defendants' failure to safeguard Plaintiff and Class Members' highly sensitive Private Information as exposed and unauthorizedly disclosed in the Data Breach violates their common law duties, California law, and Defendants' implied contract with Clients to safeguard their Private Information.

---

[3] https://americhek.com/ (last accessed Dec. 22, 2024)
[4] Notice of Data Breach Letter attached hereto as **Exhibit A**.
[5] *Id.*

2

8.      Plaintiff and Class members now face a lifetime risk of identity theft due to the nature of the information lost, which they cannot change, and which cannot be made private again.

9.      Defendants' harmful conduct has injured Plaintiff and Class members in multiple ways, including: (i) the lost or diminished value of their Private Information; (ii) costs associated with the prevention, detection, and recovery from identity theft, tax fraud, and other unauthorized use of their data; (iii) lost opportunity costs to mitigate the Data Breach's consequences, including lost time; and (iv) emotional distress associated with the loss of control over their highly sensitive Private Information.

10.     Defendants' failure to protect Plaintiff and Class Members' Private Information has harmed and will continue to harm thousands of Defendants' Clients, causing Plaintiff to seek relief on a class wide basis.

11.     On behalf of himself and the Class preliminarily defined below, Plaintiff brings causes of action against Defendants for negligence, negligence *per se*, breach of third-party beneficiary contract, breach of implied contract, invasion of privacy, breach of fiduciary duty, violation of the California Unfair Competition Law, violation of the California Consumer Records Act, and unjust enrichment, seeking an award of monetary damages and injunctive and declaratory relief,

CLASS ACTION COMPLAINT

resulting from Defendant's failure to adequately protect their highly sensitive Private Information.

## II.    JURISDICTION AND VENUE

12.    The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is over 100, and at least one Class member is a citizen of a state that is diverse from Defendants' citizenship, including Plaintiff, a citizen of California. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

13.    This Court has personal jurisdiction over Defendant, BackChecked LLC, because it has its principal place of business in Arizona and does a significant amount of business in Arizona.

14.    This Court has personal jurisdiction over Defendant, Certified Employment Screening Inc., d/b/a Americhek because it transacts business within this state and makes or performs contracts within this state.

15.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because Defendant Americhek has its principal place of business located in this District, and a substantial part of the events giving rise to this action occurred in this District.

## III.    PARTIES

16.    Plaintiff is an individual citizen of California and learned of the breach after seeing receiving a Notice of Data Breach dated December 13, 2024. Plaintiff is a Customer of Defendant Americhek.

17.    Defendant BackChecked LLC is a corporation organized under the laws of Arizona with its headquarters and principal place of business 5916 E Arcadia Ln, Phoenix, Arizona 85018.

18.    Defendant Certified Employment Screening Inc., d/b/a Americhek is a corporation organized under the laws of California with its headquarters and principal place of business at 28202 Cabot Road, Suite 245, Laguna Niguel, California 92677.

## IV.    FACTUAL ALLEGATIONS

### *Defendant Knew the Risks of Storing Valuable PII and the Foreseeable Harm to Victims.*

19.    At all relevant times, Defendants knew they were storing sensitive PII and that, as a result, Defendants' systems would be attractive targets for cybercriminals.

20.    Defendants also knew that any breach of their systems, and exposure of the information stored therein, would result in the increased risk of identity theft and fraud against the individuals whose PII was compromised.

21.     These risks are not merely theoretical; in recent years, numerous high-profile breaches have occurred at businesses such as Equifax, Yahoo, Marriott, Anthem, and many others.

22.     PII has considerable value and constitutes an enticing and well-known target to hackers. Hackers easily can sell stolen data as a result of the "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[6]

23.     The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S. According to the ITRC, in 2019, there were 1,473 reported data breaches in the United States, exposing 164 million sensitive records and 705 million "non-sensitive" records.[7]

24.     In tandem with the increase in data breaches, the rate of identity theft and the resulting losses has also increased over the past few years. For instance, in 2018, 14.4 million people were victims of some form of identity fraud, and 3.3 million people suffered unrecouped losses from identity theft, nearly three times as

---

[6]    Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/ (last visited 2/23/2024).
[7]    *Data Breach Reports: 2019 End of Year Report*, IDENTITY THEFT RESOURCE CENTER, at 2, *available at* https://notified.idtheftcenter.org/s/resource#annualReportSection.

many as in 2016. And these out-of-pocket losses more than doubled from 2016 to $1.7 billion in 2018.[8]

25.    The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Defendant's customers especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud, and more.

26.    According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the [Dark] Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[9]

27.    Even if stolen PII does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal

---

[8]  Insurance Information Institute, *Facts + Statistics: Identity theft and cybercrime*, available at https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20(1).

[9] United States Government Accountability Office, Report to Congressional Requesters, Personal Information, June 2007: https://www.gao.gov/assets/gao-07-737.pdf.

CLASS ACTION COMPLAINT

uses the previously obtained PII about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

### *Defendant Breached its Duty to Protect Plaintiff and Class Members' PII*

28.     Defendants agreed to and undertook legal duties to maintain the protected personal information entrusted to them by Plaintiff and Class Members safely, confidentially, and in compliance with all applicable laws, including the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Under state and federal law, businesses like Defendants have duties to protect their client's PII and to notify them about breaches.

29.     The Private Information held by Defendants in their computer systems and networks included the highly sensitive Private Information of Plaintiff and Class Members.

30.     In or around September 26, 2024, Defendants became aware of a ransomware attack on their systems.

### *Plaintiff and Class Members Suffered Damages*

31.     For the reasons mentioned above, Defendant's conduct, which allowed the Data Breach to occur, caused Plaintiff and Class Members significant injuries and harm in several ways. Plaintiff and Class Members must immediately devote time, energy, and money to: 1) closely monitor their medical statements, bills,

records, and credit and financial accounts; 2) change login and password information on any sensitive account even more frequently than they already do; 3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering or spear phishing attack; and 4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

32.     Once PII is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives, as a result of Defendant's conduct. Further, the value of Plaintiff's and Class Members' PII has been diminished by its exposure in the Data Breach.

33.     As a result of Defendant's failures, Plaintiff and Class Members are at substantial increased risk of suffering identity theft and fraud or misuse of Private Information.

34.     From a recent study, 28% of consumers affected by a data breach become victims of identity fraud – this is a significant increase from a 2012 study that found only 9.5% of those affected by a breach would be subject to identity fraud. Without a data breach, the likelihood of identify fraud is only about 3%.[10]

---

[10] https://blog.knowbe4.com/bid/252486/28-percent-of-data-breaches-lead-to-fraud. (last accessed Dec. 22, 2024)

CLASS ACTION COMPLAINT

35.    In the third quarter of the 2023 fiscal year alone, 7333 organizations experienced data breaches, resulting in 66,658,764 individuals' personal information being compromised.[11]

36.    Plaintiff and Class Members are also at a continued risk because their information remains in Defendants' systems, which have already been shown to be susceptible to compromise and attack and are subject to further attack so long as Defendants fail to undertake the necessary and appropriate security and training measures to protect Plaintiff and Class Member's Private Information.

37.    The Data Breach occurred as a direct result of Defendants' failure to implement and follow basic security procedures, and the failure to follow their own policies, in order to protect Plaintiff and Class Member's PII.

## V.    COMMON INJURIES AND DAMAGES

38.    As result of Defendants' ineffective and inadequate data security practices, Plaintiff and Class Members now face a present and ongoing risk of fraud and identity theft.

39.    Due to the Data Breach, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk of identity theft to Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including but not

---

[11] *See* https://www.idtheftcenter.org/publication/q3-data-breach-2023-analysis/.

limited to: (a) invasion of privacy; (b) "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (d) "out of pocket" costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) loss of time due to increased spam and targeted marketing emails; (g) the loss of benefit of the bargain (price premium damages); (h) diminution of value of their Private Information; and (i) the continued risk to their Private Information, which remains in Defendants' possession, and which is subject to further breaches, so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information.

### *The Risk of Identity Theft to Plaintiff and Class Members is Present and Ongoing*

40.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

41.    Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier

it is for the thief to take on the victim's identity – or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

42.     For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

43.     The dark web is an unindexed layer of the internet that requires special software or authentication to access.[12] Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or 'surface' web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[13]     This

---

[12] *What Is the Dark Web?*, Experian, available at https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/.
[13] *Id.*

CLASS ACTION COMPLAINT

prevents dark web marketplaces from being easily monitored by authorities or accessed by those not in the know.

44.     A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, personal and medical information like the PII at issue here.[14] The digital character of PII stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth, and medical information.[15] As Microsoft warns "[t]he anonymity of the dark web lends itself well to those who would seek to do financial harm to others."[16]

45.     Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to numerous serious fraudulent uses and are difficult for an individual to change. The Social Security

---

[14] *What is the Dark Web?* – Microsoft 365, available at https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web.

[15] *Id.; What Is the Dark Web?*, Experian, available at https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/.

[16] *What is the Dark Web?* – Microsoft 365, available at https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web.

Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[17]

46.    What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

47.    Even then, new Social Security number may not be effective, as "[t]She credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[18]

---

[17] Social Security Administration, *Identity Theft and Your Social Security Number*, available at: https://www.ssa.gov/pubs/EN-05-10064.pdf.
[18] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

48.    Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name. And the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[19]

49.    According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[20]

50.    Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[21] Defendants did not rapidly report to Plaintiffs and the Class that their Private Information had been stolen.

---

[19] *Identity Theft and Your Social Security Number*, Social Security Administration, 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf.
[20] *See* https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120.
[21] *Id.*

CLASS ACTION COMPLAINT

51.     Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

52.     In addition to out-of-pocket expenses that can exceed thousands of dollars, and the emotional toll identity theft can take, victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

53.     The Federal Trade Commission ("FTC") has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis and profit."[22]

54.     The FTC has also issued numerous guidelines for businesses that highlight the importance of reasonable data security practices. The FTC has noted the need to factor data security into all business decision-making. According to the

---

[22] Statement of FTC Commissioner Pamela Jones Harbour (Remarks Before FTC Exploring Privacy Roundtable), http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf.

CLASS ACTION COMPLAINT

FTC, data security requires: (1) encrypting information stored on computer networks; (2) retaining payment card information only as long as necessary; (3) properly disposing of personal information that is no longer needed; (4) limiting administrative access to business systems; (5) using industry-tested and accepted methods for securing data; (6) monitoring activity on networks to uncover unapproved activity; (7) verifying that privacy and security features function properly; (8) testing for common vulnerabilities; and (9) updating and patching third-party software.[23]

55.    Defendants' failure to properly notify Plaintiff and Class Members of the Data Breach exacerbated Plaintiff's and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their Private Information and take other necessary steps to mitigate the harm caused by the Data Breach.

### *Loss of Time to Mitigate the Risk of Identify Theft and Fraud*

56.    As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to

---

[23] *See generally* https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.

spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet, the resource and asset of time has been lost.

57.    Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as placing "freezes" and "alerts" with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports, which may take years to discover and detect.

58.    A study by Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:[24]



---

[24] "Credit Card and ID Theft Statistics" by Jason Steele, 10/24/2017, at https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php.

59.    In the event that Plaintiff and Class Members experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[25] Indeed, the FTC recommends that identity theft victims take several steps and spend time to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[26]

### *Diminution of Value of the Private Information*

60.    PII is a valuable property right.[27] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

---

[25] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf ("GAO Report").

[26] *See* https://www.identitytheft.gov/Steps.

[27] *See, e.g.*, John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

61.     Private Information can sell for as much as $363 per record according to the Infosec Institute.[28]

62.     An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[29] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[30, 31] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50 a year.[32]

63.     As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished in its value by its unauthorized and potential release onto the Dark Web, where it may soon be available and holds significant value for the threat actors.

---

[28] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/.
[29] https://www.latimes.com/business/story/2019-11-05/column-data-brokers.
[30] https://datacoup.com/.
[31] https://digi.me/what-is-digime/.
[32] Nielsen Computer & Mobile Panel, Frequently Asked Questions, available at https://computermobilepanel.nielsen.com/ui/US/en/faqen.html.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

***Future Cost of Credit and Identify Theft Monitoring is Reasonable and Necessary***

64.    To date, Defendants have done little to provide Plaintiff and Class Members with relief for the damages they have suffered as a result of the Data Breach, despite Plaintiff and Class Members being at risk of identity theft and fraud for the foreseeable future. Defendants have not offered any material relief, other than services with an identity protection service. Furthermore, this is a tacit admission that its failure to protect their Private Information has caused Plaintiff and Class great injuries.

65.    Defendants also placed the burden squarely on Plaintiff and Class Members by requiring them to expend time signing up for that service, as opposed to automatically enrolling all victims of this Data Breach. *Id.*

66.    Given the type of targeted attack in this case and sophisticated criminal activity, the type of Private Information, and the *modus operandi* of cybercriminals, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes – e.g., opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

CLASS ACTION COMPLAINT

67.    Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

68.    Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts.[33] The information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as Social Security numbers).

69.    Consequently, Plaintiff and Class Members are at a present and ongoing risk of fraud and identity theft for many years into the future.

70.    The retail cost of credit monitoring and identity theft monitoring can cost $200 or more a year per Class Member. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from Defendants' Data Breach. This is a future cost for a minimum of five years that Plaintiff and Class

---

[33] *See* Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds*, FORBES (Mar. 25, 2020), https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1.

Members would not need to bear but for Defendants' failure to safeguard their Private Information.

***Injunctive Relief is Necessary to Protect Against Future Data Breaches***

71.     Moreover, Plaintiff and Class Members have an interest in ensuring that Private Information, which is believed to remain in the possession of Defendants, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing Private Information is not accessible online and that access to such data is password protected.

72.     Because of Defendants' failure to prevent the Data Breach, Plaintiff and Class members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses and lost time. Also, they have suffered or are at an increased risk of suffering:

    a.  loss of the opportunity to control how their Private Information is used;

    b.  diminution in value of their Private Information;

    c.  compromise and continuing publication of their Private Information;

    d.  out-of-pocket costs from trying to prevent, detect, and recovery from identity theft and fraud;

    e.  lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting,

contesting, and recovering from identify theft and fraud;

f.  delay in receipt of tax refund monies;

g.  unauthorized use of their stolen Private Information; and

h.  continued risk to their Private Information —which remains in Defendants' possession—and is thus as risk for futures breaches so long as Defendants fail to take appropriate measures to protect the Private Information.

### *Lack of Compensation*

73.    Plaintiff and Class Members have been damaged by the compromise and exfiltration of their Private Information in the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of this Data Breach.

74.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have been placed at an actual, imminent, and substantial risk of harm from fraud and identity theft.

75.    Further, Plaintiff and Class Members have been forced to expend time dealing with the effects of the Data Breach and face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft. Plaintiff and Class Members may also incur out-of-pocket

costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

76.    Specifically, many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

   a.  Finding fraudulent charges;

   b.  Canceling and reissuing credit and debit cards;

   c.  Purchasing credit monitoring and identity theft prevention;

   d.  Addressing their inability to withdraw funds linked to compromised accounts;

   e.  Taking trips to banks and waiting in line to obtain funds held in limited accounts;

   f.  Placing "freezes" and "alerts" with credit reporting agencies;

   g.  Spending time on the phone with or at a financial institution to dispute fraudulent charges;

   h.  Contacting financial institutions and closing or modifying financial accounts;

   i.  Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

   j.  Paying late fees and declined payment fees imposed as a result of failed

automatic payments that were tied to compromised cards that had to be cancelled; and

k. Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

77.    In addition, Plaintiff and Class Members also suffered a loss of value of their Private Information when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the property of loss of value damages in related cases.

78.    Plaintiff and Class Members are forced to live with the anxiety that their Private Information —which contains the most intimate details about a person's life—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

79.    Defendants' delay in identifying and reporting the Data Breach caused additional harm. In a data breach, time is of the essence to reduce the imminent misuse of Private Information. Early notification helps a victim of a Data Breach mitigate their injuries, and in the converse, delayed notification causes more harm and increases the risk of identity theft. Here, Defendants knew of the breach and waited months before beginning to formally notify all victims.

## VI.    CLASS ACTION ALLEGATIONS

80.    Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3), on behalf of a class defined as:

**Nationwide**: All individuals whose PII was accessed and/or acquired by an unauthorized party in the Data Breach, including all who were sent a notice of the Data Breach.

**California Subclass**: All residents of California, Defendants have identified as being among those individuals impacted by the Data Breach, including all who were sent a notice of the Data Breach (the "Class")

81.    Excluded from the Class are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

82.    Plaintiff reserves the right to amend the definition of the Class or add a Class or Subclass if further information and discovery indicate that the definition of the Class should be narrowed, expanded, or otherwise modified.

83.    Numerosity. The Class Members are so numerous that joinder of all members is impracticable. Upon information, thousands of individuals had their PII compromised in this Data Breach. The identities of Class Members are ascertainable

through Defendants' records, Class Members' records, publication notice, self-identification, and other means.

84.    **Commonality.** There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a.  Whether and to what extent Defendants had respective duties to protect the Private Information of Plaintiff and Class members;

b.  Whether Defendants had respective duties not to disclose the Private Information of Plaintiff and Class members to unauthorized third parties;

c.  Whether Defendants had respective duties not to use the Private Information of Plaintiff and Class members for non-business purposes;

d.  Whether Defendants failed to adequately safeguard the Private Information of Plaintiff and Class members;

e.  Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

f.  Whether Defendants adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

g.  Whether Plaintiff and Class members are entitled to actual damages, statutory damages, and/or nominal damages as a result of Defendants' wrongful conduct; and

h.  Whether Plaintiff and Class members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

85.    Typicality. Plaintiff's claims are typical of those of other Class Members because Plaintiff's PII, like that of every other Class Member, was compromised in the Data Breach.

86.    This class action is also appropriate for certification because Defendants acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply to and affect Class members uniformly and Plaintiff's challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

87.    Adequacy of Representation. Plaintiff will fairly and adequately represent and protect the interests of the Class Members. Plaintiff's Counsel is

competent and experienced in litigating Class actions, including data privacy litigation of this kind.

88.    Predominance. Defendants have engaged in a common course of conduct toward Plaintiff and Class Members, in that all the Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

89.    Superiority. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

90.    Defendants have acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

91.    Further, Defendants have acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

a.    Whether Defendants owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

b.    Whether Defendants' security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

c.    Whether Defendants' failure to institute adequate protective security measures amounted to negligence;

d.    Whether Defendants' failure to institute adequate protective security measures amounted to breach of an implied contract;

e.    Whether Defendants failed to take commercially reasonable steps to safeguard consumer Private Information; and

f. Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

92. Finally, all members of the proposed Class are readily ascertainable. Defendants have access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendants.

## VII.  CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (On behalf of Plaintiff and all Class Members)

93. Plaintiff hereby repeats and realleges paragraphs 1 through 92 of this Complaint and incorporates them by reference herein.

94. Defendants owed respective duties under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their Private Information in their possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

95. Defendants' duties to use reasonable care arose from several sources, including but not limited to those described below.

96.     Defendants had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of Defendants. By collecting and storing Private Information that is routinely targeted by criminals for unauthorized access, Defendants were obligated to act with reasonable care to protect against these foreseeable threats.

97.     Defendants' duty also arose from Defendants' position as an employment service provider. Defendants hold themselves out as trusted data collectors and thereby assumes a duty to reasonably protect their customers' employees' information. Indeed, Defendants, as direct data collectors, were in a unique and superior position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

98.     Defendants breached the duties owed to Plaintiff and Class Members and thus were negligent. Defendants breached these duties by, among other things: (a) mismanaging their systems and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PII; (b) mishandling their data security by failing to assess the sufficiency of the safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and

monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust their information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; and (g) failing to follow their own privacy policies and practices published to their clients.

99.    But for Defendants' wrongful and negligent breach of their duties owed to Plaintiff and Class Members, their Private Information would not have been compromised.

100.    As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members have suffered injuries, including:

a.  Theft of their Private Information;

b.  Costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts;

c.  Costs associated with purchasing credit monitoring and identity theft protection services;

d.  Lowered credit scores resulting from credit inquiries following fraudulent activities;

e.  Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Defendant Data Breach –

including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f.  The imminent and certainly impinging injury flowing from the increased risk of potential fraud and identity theft posed by their PII being placed in the hands of criminals;

g.  Damages to and diminution in value of their Private Information entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

h.  Continued risk of exposure to hackers and thieves of their Private Information, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data;

i.  The erosion of the essential and confidential relationship between Defendant—as a employer services provider—and Plaintiff and Class members as customers; and

j.  Loss of personal time spent carefully reviewing statements from financial accounts to check for unauthorized charges and/or access.

101.  As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

## COUNT TWO
### NEGLIGENCE *PER SE*
### (On behalf of Plaintiff and all Class Members)

102.  Plaintiff hereby repeats and realleges paragraphs 1 through 92 of this Complaint and incorporates them by reference herein.

103.  Pursuant to the Federal Trade Commission Act, 15 U.S.C. § 45, Defendants had respective duties to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class members' Private Information.

104.  Defendants breached their duties to Plaintiff and Class members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class members' Private Information.

105.  Defendants' failure to comply with applicable laws and regulations constitutes negligence *per se.*

106.   The injuries to Plaintiff and Class members resulting from the Data Breach were directly and indirectly caused by Defendants' violation of the statutes described herein.

107.   Plaintiff and Class members were within the class of persons the Federal Trade Commission Act were intended to protect and the type of harm that resulted from the Data Breach was the type of harm these statues were intended to guard against.

108.   But for Defendants' wrongful and negligent breach of their duties owed to Plaintiff and Class members, Plaintiff and Class members would not have been injured.

109.   The injuries and harms suffered by Plaintiff and Class members were the reasonably foreseeable result of Defendants' breach of their duties. Defendants knew or should have known that they were failing to meet their duties and that Defendants' breach would cause Plaintiff and Class members to experience the foreseeable harms associated with the exposure of their Private Information.

110.   As a direct and proximate result of Defendants' negligent conduct, Plaintiff and Class members have suffered injuries and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

## COUNT THREE
### BREACH OF THIRD-PARTY BENFICIARY CONTRACT
### (On Behalf of Plaintiff and all Class Members)

111.   Plaintiff hereby repeats and realleges paragraphs 1 through 92 of this Complaint and incorporates them by reference herein.

112.   Upon information and belief, Defendants entered into virtually identical contracts with their clients to provide software products and/or services, which included data security practices, procedures, and protocols sufficient to safeguard the Private Information that was to be entrusted to them.

113.   Such contracts were made expressly for the benefit of Plaintiff and the Class, as it was their Private Information that Defendants agreed to receive and protect through their services. Thus, the benefit of collection and protection of the Private Information belonging to Plaintiff and the Class was the direct and primary objective of the contracting parties, and Plaintiff and Class Members were direct and express beneficiaries of such contracts.

114.   Defendants knew that if they were to breach these contracts with their clients, Plaintiff and the Class would be harmed.

115.   Defendants breached their contracts with their clients and, as a result, Plaintiff and Class Members were affected by this Data Breach when Defendants failed to use reasonable data security and/or business associate monitoring measures that could have prevented the Data Breach.

116.    As foreseen, Plaintiff and the Class were harmed by Defendants' failure to use reasonable data security measures to securely store and protect the files in their care, including but not limited to, the continuous and substantial risk of harm through the loss of their Private Information.

117.    Accordingly, Plaintiff and the Class are entitled to damages in an amount to be determined at trial, along with costs and attorneys' fees incurred in this action.

### COUNT FOUR
### BREACH OF IMPLIED CONTRACT
### (On behalf of Plaintiff and all Class Members)

118.    Plaintiff hereby repeats and realleges paragraphs 1 through 92 of this Complaint and incorporates them by reference herein.

119.    Defendants offered to provide services to Clients, in exchange for payment.

120.    Plaintiff and Class members were required to provide their Private Information to the Defendants to receive benefits.

121.    In turn, Defendants impliedly promised to protect Plaintiff's and Class members' Private Information through adequate data security measures.

122.    Plaintiff and Class members would not have otherwise entrusted their Private Information to Defendants.

123.   Defendants materially breached their agreement(s) with its Clients by failing to safeguard such Private Information, violating industry standards necessarily incorporated in the agreement.

124.   Plaintiff and Class members have performed under the relevant agreements, or such performance was waived by the conduct of Defendants.

125.   The covenant of good faith and fair dealing is an element of every contract. All such contracts impose on each party a duty of good faith and fair dealing. The parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract along with its form.

126.   Defendants' conduct as alleged herein also violated the implied covenant of good faith and fair dealing inherent in every contract.

127.   The losses and damages Plaintiff and Class members sustained as described herein were the direct and proximate result of Defendants' breaches of the implied contracts with them, including breach of the implied covenant of good faith and fair dealing.

## COUNT FIVE
### Invasion of Privacy
### (On behalf of the Plaintiff and all Class Members)

128.    Plaintiff repeats and re-alleges paragraphs 1 through 92 of this Complaint and incorporates them by reference herein.

129.    Plaintiff and Class Members had a legitimate expectation of privacy regarding their PII and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

130.    Defendants owed respective duties to Plaintiff and Class Members to keep their PII confidential.

131.    The unauthorized disclosure and/or acquisition (*i.e.,* theft) by a third party of Plaintiff's and Class Members' Personal Information is highly offensive to a reasonable person.

132.    Defendants' reckless and negligent failure to protect Plaintiff's and Class Members' PII constitutes an intentional interference with Plaintiff's and the Class Members' interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

133.    Defendants' failure to protect Plaintiff's and Class Members' PII acted with a knowing state of mind when it permitted the Data Breach because they knew their information security practices were inadequate.

134.   Defendants knowingly did not notify Plaintiff and Class Members in a timely fashion about the Data Breach.

135.   Because Defendants failed to properly safeguard Plaintiff's and Class Members' Personal Information, Defendants had notice and knew that their inadequate cybersecurity practices would cause injury to Plaintiff and the Class.

136.   As a proximate result of Defendants' acts and omissions, the private and sensitive Personal Information of Plaintiff and the Class Members was stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiff and the Class to suffer damages.

137.   Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their Personal Information is still maintained by Defendants with their inadequate cybersecurity system and policies.

138.   Plaintiff and Class Members have no adequate remedy at law for the injuries relating to Defendants' continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendant's inability to safeguard the Personal Information of Plaintiff and the Class.

139.   Plaintiff, on behalf of himself and Class Members, seeks injunctive relief to enjoin Defendant from further intruding into the privacy and confidentiality of Plaintiff's and Class Members' Personal Information.

140.   Plaintiff, on behalf of himself and Class Members, seeks compensatory damages for Defendants' invasion of privacy, which includes the value of the privacy interest invaded by Defendants, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest, and costs.

## COUNT SIX
### BREACH OF FIDUCIARY DUTY
### (On behalf of Plaintiff and all Class Members)

141.   Plaintiff hereby repeats and realleges paragraphs 1 through 92 of this Complaint and incorporates them by reference herein.

142.   Plaintiff and the other Class members gave Defendants their Personal Information believing that Defendants would protect that information. Plaintiff and the other Class members would not have provided Defendants with this information had they known it would not be adequately protected. Defendants' acceptance and storage of Plaintiff's and the other Class members' Personal Information created a fiduciary relationship between Defendants on the one hand, and Plaintiff and the other Class members, on the other hand. In light of this relationship, Defendants must act primarily for the benefit of their clients, which includes safeguarding and protecting Plaintiff's and the other Class members' Personal Information.

143.   Due to the nature of the relationship between Defendants and Plaintiff and the other Class members, Plaintiff and the other Class members were entirely reliant upon Defendants to ensure that their Personal Information was adequately

protected. Plaintiff and the other Class members had no way of verifying or influencing the nature and extent of Defendants or their vendors' data security policies and practices, and Defendants were in an exclusive position to guard against the Data Breach.

144.    Defendants have respective fiduciary duties to act for the benefit of Plaintiff and the other Class members upon matters within the scope of their relationship. They breached that duty by contracting with companies that failed to properly protect the integrity of the systems containing Plaintiff's and the other Class members' Personal Information, failing to properly protect the integrity of their systems containing Plaintiff's and the other Class members' Personal Information, failing to comply with the data security guidelines set forth by the FTC Act, and otherwise failing to safeguard Plaintiff's and the other Class members' Personal Information that they collected.

145.    As a direct and proximate result of Defendants breach of their fiduciary duties, Plaintiff and the other Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their Personal Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their Personal Information; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data

Breach; (v) the continued risk to their Personal Information which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the Personal Information compromised as a result of the Data breach; (vii) loss of potential value of their Personal Information; (viii) overpayment for the services that were received without adequate data security.

## **COUNT SEVEN**
**Violation of the California Unfair Competition Law**
**[Cal. Bus. & Prof. Code § 17200, et seq. – Unlawful Business Practices]**
**(On Behalf of Plaintiff and the California Subclass)**

146.   Plaintiff repeats and re-alleges paragraphs 1 through 92 of this Complaint and incorporates them by reference herein.

147.   Defendants violated Cal. Bus. and Prof. Code § 17200, et seq., by engaging in unlawful, unfair or fraudulent business acts and practices and unfair, deceptive, untrue or misleading advertising that constitute acts of "unfair competition" as defined in Cal. Bus. Prof. Code § 17200 with respect to the services provided to the Class.

148.   Defendants engaged in unlawful acts and practices with respect to the services by establishing the sub-standard security practices and procedures described herein; by soliciting and collecting Plaintiff's and Class Members' PII with knowledge that the information would not be adequately protected; and by storing Plaintiff's and Class Members' Personal Information in an unsecure electronic

environment in violation of California's data breach statute, Cal. Civ. Code § 1798.81.5, which requires Defendants to take reasonable methods for safeguarding the PII of Plaintiff and the Class Members.

149.    In addition, Defendants engaged in unlawful acts and practices by failing to disclose the Data Breach in a timely and accurate manner, contrary to the duties imposed by Cal. Civ. Code § 1798.82.

150.    As a direct and proximate result of Defendants' unlawful practices and acts, Plaintiff and Class Members were injured and lost money or property, including but not limited to the price received by Defendants for the products and services, the loss of Plaintiff's and Class Members' legally protected interest in the confidentiality and privacy of their Personal Information, nominal damages, and additional losses as described herein.

151.    Defendants knew or should have known that their computer systems and data security practices were inadequate to safeguard Plaintiff's and Class Members' PII and that the risk of a data breach or theft was highly likely. Defendants' actions in engaging in the above-named unlawful practices and acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiff and Class Members.

152.    Plaintiff, on behalf of the Class, seeks relief under Cal. Bus. & Prof. Code § 17200, et seq., including, but not limited to, restitution to Plaintiff and Class

Members of money or property that Defendants may have acquired by means of their unlawful, and unfair business practices, disgorgement of all profits accruing to Defendants because of their unlawful and unfair business practices, declaratory relief, attorneys' fees and costs (pursuant to Cal. Code Civ. Proc. § 1021.5), and injunctive or other equitable relief.

**COUNT EIGHT**
**Violations of the California Consumer Records Act**
**Cal. Civ. Code § 1798.80, *et seq*.**
**(On Behalf of Plaintiff and the California Subclass)**

153.    Plaintiff repeats and re-alleges paragraphs 1 through 92 of this Complaint and incorporates them by reference herein.

154.    Under the California Consumer Records Act, any "person or business that conducts business in California, and that owns or licenses computerized data that includes personal information" must "disclose any breach of the system following discovery or notification of the breach in the security of the data to any resident of California whose unencrypted personal information was, or is reasonably believes to have been, acquired by an unauthorized person." Cal. Civ. Code § 1798.82. The disclosure must "be made in the most expedient time possible and without unreasonable delay" but disclosure must occur "immediately following discovery [of the breach], if the personal information was, or is reasonable believes to have been, acquired by an unauthorized person." *Id.* (emphasis added).

155. The Data Breach constitutes a "breach of the security system" of Defendants.

156. An unauthorized person acquired the personal, unencrypted information of Plaintiff and the Class.

157. Defendants knew that an unauthorized person had acquired the personal, unencrypted information of Plaintiff and the Class but waited approximately four months to notify them. Given the severity of the Data Breach, this is an unreasonable delay.

158. Defendants' unreasonable delay prevented Plaintiff and the Class from taking appropriate measures from protecting themselves against harm.

159. Because Plaintiff and the Class were unable to protect themselves, they suffered incrementally increased damages that they would not have suffered with timelier notice.

160. Plaintiff and the class are entitled to equitable relief and damages in an amount to be determined at trial.

## COUNT NINE
### UNJUST ENRICHMENT
**(On behalf of Plaintiff and all Class Members)**

161. Plaintiff hereby repeats and realleges paragraphs 1 through 92 of this Complaint and incorporates them by reference herein.

162.   Plaintiff brings this claim in the alternative to his breach of third-party beneficiary contract claim above.

163.   Plaintiff and Class Members conferred a monetary benefit on Defendants. Specifically, they provided Defendants with their Private Information. In exchange, Defendants should have provided adequate data security for Plaintiff's and Class Members'.

164.   Defendants knew that Plaintiff and Class Members conferred a benefit on them in the form their Private Information as a necessary part of the employment related services with Defendants' clients. Defendants appreciated and accepted that benefit. Defendants profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes.

165.   Upon information and belief, Defendants fundstheir data security measures entirely from their general revenue, including payments on behalf of or for the benefit of Plaintiff and Class Members.

166.   As such, a portion of the payments made for the benefit of or on behalf of Plaintiff and Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendants.

167.    Defendants, however, failed to secure Plaintiff's and Class Members' Private Information and, therefore, did not provide adequate data security in return for the benefit Plaintiff and Class Members provided.

168.    Defendants would not be able to carry out an essential function of their regular business without the Private Information of Plaintiff and Class Members and derived revenue by using it for business purposes. Plaintiff and Class Members expected that Defendants or anyone in Defendants' position would use a portion of that revenue to fund adequate data security practices.

169.    Defendants acquired the Private Information through inequitable means in that they failed to disclose the inadequate security practices previously alleged.

170.    If Plaintiff and Class Members knew that Defendants had not reasonably secured their Private Information, they would not have allowed their Private Information to be provided to Defendants.

171.    Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Personal Information. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendants instead calculated to increase their own profit at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures and diverting those funds to their own profit. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate

result of Defendants' decisions to prioritize their own profits over the requisite security and the safety of their Private Information.

172.   Under the principles of equity and good conscience, Defendants should not be permitted to retain the money wrongfully obtained Plaintiff and Class Members, because Defendants failed to implement appropriate data management and security measures that are mandated by industry standards.

173.   Plaintiff and Class Members have no adequate remedy at law.

174.   As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) experiencing an increase in spam calls, texts, and/or emails; (viii) statutory damages; (ix) nominal damages; and (x) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

175.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

176.    Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them. In the alternative, Defendants should be compelled to refund the amounts that Plaintiff and Class Members overpaid for Defendants' services.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and Class members, requests judgment against Defendants and that the Court grants the following:

A. For an order certifying the Class and Subclass, as defined herein, and appointing Plaintiff and his Counsel to represent the Class;

B. For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Private Information of Plaintiff and Class members, and from refusing to issue prompt, complete, any accurate disclosures to Plaintiff and Class members;

C. For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the

interests of Plaintiff and Class members, including but not limited to an order:

 i. prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

 ii. requiring Defendants to protect, including through encryption, all data collected through the course of business in accordance with all applicable regulations, industry standards, and federal, state, or local laws.

 iii. requiring Defendants to delete, destroy, and purge the Private Information of Plaintiff and Class members unless Defendants can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class members;

 iv. requiring Defendants to implement and maintain a comprehensive information security program designed to protect the confidentiality and integrity of the Private Information of Plaintiff and Class members;

 v. prohibiting Defendants from maintaining the Private Information of Plaintiff and Class members on a cloud-based database;

vi.     requiring Defendants to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

vii.    requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.   requiring Defendants to audit, test, and train their security personnel regarding any new or modified procedures;

ix.     requiring Defendants to segment data by, among other things, creating firewalls and access controls so that if one area of Defendants' network is compromised, hackers cannot gain access to other portions of Defendants' systems;

x.      requiring Defendants to conduct regular database scanning and security checks;

xiv.    requiring Defendants to implement, maintain, regularly review, and revise as necessary a threat management program designed

to appropriately monitor Defendants' information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv.    requiring Defendants to meaningfully educate all Class members about the threats that they face as a result of the loss of their confidential Private Information to third parties, as well as the steps affected individuals must take to protect themselves; and

xvi.    requiring Defendants to implement logging and monitoring programs sufficient to track traffic to and from Defendants' servers; and for a period of 10 years, appointing a qualified and independent third-party assessor to conduct an attestation on an annual basis to evaluate Defendants' compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment.

D. For an award of damages, including actual, statutory, nominal, and consequential damages, as allowed by law in an amount to be determined by a jury at trial;

E.  For an award of attorneys' fees, costs, and litigation expenses, as

allowed by law;

F.  For prejudgment interest on all amounts awarded; and

G.  Such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury.

Dated: December 23, 2024                    Respectfully Submitted,

By: */s/ Andrew J. Shamis*
Andrew J. Shamis (AZ Bar No.037343)
**SHAMIS & GENTILE, P.A.**
14 NE 1st Ave, Suite 705
Miami, FL 33132
Tel: (305) 479-2299
Email: ashamis@shamisgentile.com

*Attorney for Plaintiff and Proposed Class*